IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNIVERSITY MEDICAL CENTER CORPORATION<br><br>           Plaintiff,<br><br>vs.<br><br>MICHAEL O. LEAVITT,<br><br>           Defendant. | No. CV 05-0495-TUC-JMR-(BPV)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the court are cross motions for summary judgment pursuant to Fed. R.Civ.P. 56(b) and Rule 56.1 of this Court filed by the plaintiff, University Medical Center Corporation, and the defendant, Michael O. Leavitt, Secretary of the Department of Health and Human Services. The motions are fully briefed and ripe for disposition.

On September 22, 2005, this case was randomly referred to Magistrate Judge Bernardo P. Velasco. On November 15, 2006, the Magistrate Judge heard oral argument on the cross motions. (Document #'s 19, 23). There being no genuine issue as to any material fact, for reasons which follow, the Magistrate Judge recommends that the District Court DENY Defendant's Motion for Summary Judgment and GRANT Plaintiff University Medical Center Corporation's Cross-Motion for Summary Judgment.

## BACKGROUND

This civil action arises out of Defendant's failure to reimburse Plaintiff amounts due under the Medicare program of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, as determined by a "proxy" formula add-on to the prospective payment system, for the

1998-1999 fiscal years. The amount in dispute relates to Plaintiff's indirect medical education ("IME") costs for the training of medical school graduates assigned to participate in scholarly research.

## I. Governing Statutes and Regulations

Medicare is a federal health insurance program funded by the federal government and established in 1965 to provide health insurance to the aged and disabled. 42 U.S.C. § 1395 *et seq.* The United States Department of Health and Human Services ("HHS") administers the Medicare program through its component Centers for Medicare and Medicaid Services[1] ("CMS"). Hospitals that provide services to Medicare patients are reimbursed for their expenses under Title XVII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* Part A of the Medicare Act authorizes payment to participating hospitals ("providers") for their direct and indirect costs of providing inpatient care to beneficiaries. 42 C.F.R. § 413.9(a), (b). Medicare also reimburses teaching hospitals for the costs of graduate medical education, including physician time for instructing and supervising interns and residents. 42 U.S.C. § 13952ww(h).

Medicare services are furnished by "providers of services" that have entered into provider agreements with the Secretary of the United States Department of Health and Human Services. 42 U.S.C. § 1395x(u), 1395cc. To receive payment from the Secretary, providers are required to comply with the provider agreement, as well as all Medicare statutes and regulations. 42 U.S.C. § 1395cc(b)(2).

The Secretary contracts with fiscal intermediaries, such as Blue Cross Blue Shield Association in the instant case, to audit the costs submitted by Medicare provider hospitals and approve or disapprove Medicare reimbursement. See 42 U.S.C. § 1395h; 42 C.F.R. 405.902 (defining fiscal intermediary).

---

[1] Formerly known as the Health Care Financing Administration.

- 2 -

A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the HHS's Provider Reimbursement Review Board ("RRB"). 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. The PRRB is authorized to hold a hearing on the appeal and issue a decision. *Id*. A party may appeal the PRRB's decision to the Secretary's delegate, the Administrator of CMS. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. 405.1875. If the CMS Administrator decides to review the case, he or she may affirm, reverse, modify or remand the PRRB's decision. 42 C.F.R. § 405.1875. The final decision of the PRRB, or of the CMS Administrator if he or she exercises the right of review, is subject to judicial review. 42 U.S.C. § 1395oo(f)(1).

From its inception, Medicare reimbursed hospitals for the actual costs of treating Medicare patients, subject to a reasonable-cost limitation. The Medicare Act defines "reasonable cost" as "the cost actually incurred," less any costs "unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).

In 1983, Congress amended the Medicare Act and established a prospective payment system for reimbursing inpatient operating costs of acute care hospitals. See 42 U.S.C. § 1395ww(d). Hospitals now are reimbursed on the basis of prospectively determined national and regional rates for each discharge, rather than on the basis of retrospectively determined reasonable costs incurred. Under this system, payment is made at a predetermined rate for each hospital discharge, according to the patient's diagnostic related group ("DRG"). Congress intended this method of payment to encourage hospitals to increase efficiency. See H.R.Rep. No. 98-25, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351.

When Congress implemented the DRG system, it was concerned that those payments would not adequately reimburse teaching hospitals because such hospitals typically have higher costs per patient than non-teaching hospitals. S.Rep. No. 98-23, at 52 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 192; H.R.REp. No. 98-25, at 140 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 359. Thus, the DRG payment–calculated

on average per-patient costs in a particular region–would not reflect teaching hospitals increased expenses. The prior reimbursement system also had this problem because the reasonable-cost limitations it used were similarly calculated, though not on a prospective basis. Under the prior system, Congress had allowed adjustments to the reasonable-cost limitations if a provider could show its increased costs were due to its educational activities. Under the new system, Congress carried forward the policy of paying teaching hospitals more, allowing their increased expenses to be separately reimbursed by Medicare. Three types of increased costs were identified: direct medical education ("DME") expenses, capital expenses, and indirect medical education ("IME") expenses. DME expenses are expenses like residents' salaries–quantifiable expenses directly related to teaching. Capital expenses are those expenses like depreciation and rents. And IME expenses reflect the general inefficiencies associated with patient care provided by residents and interns, including "the additional tests and procedures ordered by residents as well as the extra demands placed on other staff as they participate in the educational process." *Id*.

IME expenses are not easily quantified. So the Secretary created a formula to calculate how much money teaching hospitals would get for IME expenses. That formula–derived from a statistical analysis of teaching hospitals' costs compared to non-teaching hospitals' costs that takes into account the ration of residents and interns to beds, 45 Fed.Reg. 21,584 (Apr. 1, 1980)–basically allows teaching hospitals to get a payment that represents a fraction of their DRG revenue. For example, if the Secretary's formula–which is now codified in 42 U.S.C. § 1395ww(d)(5)(B)–yields an "indirect teaching adjustment factor" of .10, then a teaching hospital that has $10,000 of DRG revenue in a given cost reporting period (i.e., fiscal year) would get an additional payment of $1,000 as reimbursement for IME expenses.

In 2001, after the fiscal years at issue in this case, the Secretary promulgated a regulation designed to "clarify" and remove confusion in the provider community,

- 4 -

1 regarding "whether the time that residents spend performing research is countable" for
2 purposes of IME adjustment. 66 Fed.Reg. 39,828, 39, 896 (Aug. 1, 2001). The rule
3 explicitly provides that, in isolating the "portion of the hospital subject to the
4 prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(a), and the "outpatient
5 department," 42 C.F.R. § 412.105(f)(1)(ii)(B), the time spent by a resident in research
6 that is not associated with the treatment or diagnosis of a particular patient is not
7 countable." 42 C.F.R. § 412.105(F)(1)(iii)(B).

## II. Factual and Procedural History

Plaintiff University Medical Center ("Plaintiff" or "Hospital") is an acute-care, non-profit hospital located in Tucson, Arizona. In affiliation with the University of Arizona Health Sciences Center, the Hospital operates a graduate medical education program for interns and residents in 37 specialties and subspecialty areas. The program involves interns and residents in patient care and residents generally "rotate" through a number of planned training areas in connection with their specialization area. The Hospital participates in the federal governments Medicare program and submitted Medicare cost reports for its 1998 and 1999 fiscal years ("FY").

The residency programs at issue in this case are approved by the Accreditation Council for Graduate Medical Education ("ACGME"), an organization recognized by the Center for Medicare & Medicaid Services ("CMS") as an acceptable authority for determining which graduate medical education programs are "approved" for purposes of the Medicare program and the indirect medical education payment regulations.

The ACGME generally requires that in order for a given residency program to be "approved," the program must ensure that residents and faculty participate in "research and scholarly activity." Residents in the Hospital's approved residency program are required to participate in research activities in order to obtain their specialty or subspecialty certifications.

- 5 -

1       For purposes of completing its Medicare cost reports for FY 1998 and 1999, the
2  Hospital included the time spent by residents engaged in research and other scholarly
3  activities who were assigned to the Hospital when determining its resident count for
4  purposes of the IME calculation.

5       Blue Cross Blue Shield Association ("Association") is the Hospital's fiscal
6  intermediary under a contract with the Secretary.  In the region where the Hospital is
7  located, the Association subcontracted its Medicare payment administration duties to
8  Blue Cross Blue Shield of Arizona ("BCBSA") (the Association" and BCBSA are
9  collectively referred to herein as the "Intermediary").

10      After its audit, the Intermediary adjusted the Hospital's 1998 and 1999 FY IME
11 payments to reflect an exclusion of time spent by residents engaged in the research and
12 other scholarly activities portions of their approved residency programs from the IME
13 calculation.  The Intermediary's justification for removing this time was that the
14 residents in research rotations were not "involved in usual patient care."  This
15 adjustment resulted in a loss of 10.06 full time equivalent ("FTE") residents for 1998
16 and 4.96 FTE residents for 1999.  The negative reimbursement impact of this
17 disallowance to the Hospital is approximately $428,626.

18      The Hospital timely appealed its FY 1998 and 1999 cost reports to the Provider
19 Reimbursement Review Board ("PRRB"), appealing the Intermediary's disallowance
20 of resident time spent in research and other scholarly activities.  After an in-person
21 hearing on January 15, 2005, the PRRB held in favor of the Hospital on this issue,
22 finding that the regulation for the relevant time period did not exclude resident research
23 time from the IME resident count, and did not require resident time be related to patient
24 care. The PRRB also stated that the 2001 amendment to the IME regulation purporting
25 to exclude non-patient care research time from the resident count "represents a change
26 in policy that cannot be applied retroactively to the subject 1998 and 1999 cost
27 reporting periods."

28

On June 7, 2005, the CMS administrator reversed the PRRB's decision.

Having exhausted its administrative remedies, the Hospital timely appealed the Administrator's final decision, pursuant to its rights under Section 1878(f) of the Social Security Act and 42 C.F.R. § 405.1877.

## DISCUSSION

### I.   Plaintiff's Position

The historical purpose and design of the IME payment, together with the plain language of the statute and applicable regulations, compel the legal conclusion that residents in approved graduate medical education programs who are assigned to a certain hospital must be included in that hospital's count of residents regardless of the nature of their training activities.  See 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105(f)(1)(1998 &1999).

### II.   Defendant's Position

The regulation that was in effect at the times relevant to this case limited the FTE count to those hours where the student doctors were assigned to the "portion of the hospital subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A) (1999), or to the "hospital outpatient department."  42 C.F.R. § 412.105(f)(1)(ii)(B)(1999).  Because assignment to the area of scholarly research does not fall within either category, the "time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient" could reasonably be excluded from the FTE count, 42 C.F.R. § 412.105(f)(1)(iii)(B), as the regulations now provide expressly.

### III.   Standard of Review

The final decision of the Secretary is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. 42 U.S.C. § 1395oo(f)(1) (incorporating the APA standard of review).  Under the APA, the Secretary's decision is set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence,

1  or contrary to law.  5 U.S.C. § 706(2).  *See Pacific Coast Medical Enterprises v. Harris*,
2  633 F.2d 123, 130 (9th Cir. 1980); *Good Samaritan Hospital, Corvallis v. Mathews*, 609
3  F.2d 949, 951 (9th Cir. 1979).

4  An agency's construction of the statute it administers is generally governed by
5  *Chevron U.S.A., Inc. v. Natural Res.Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the
6  court must review the agency's construction of the statute to determine if the intent of
7  Congress is clear, and, if so, give effect to the unambiguously expressed intent of
8  Congress.  *Chevron*, 467 U.S. at 842-43.  If the court determines that Congress has not
9  directly addressed the precise question at issue, the court must determine whether the
10 agency's interpretation is based on a permissible construction of the statute.  *Id*. at 843.
11 Administrative interpretations which are contrary to clear congressional intent must be
12 rejected.  *Id* at n.9.

13 When reviewing the Secretary's construction of a Medicare statute under the
14 standard in *Chevron*, *Id.*, the Court must defer to the Secretary's judgment unless the
15 statutory text "unambiguously forbids" his view or his interpretation "exceeds the
16 bounds of the permissible" for other reasons.  *Barnhart v. Walton*, 535 U.S. 212, 218
17 (2002).  To meet this test, the Secretary's reading "need not be the only reasonable one,"
18 *Conn. Dep't of Income Maint. v. Heckler*, 471 U.S. 524, 532 (1985), or even "the best
19 or most natural one by grammatical or other standards."  *Pauley v. BethEnergy Mines,*
20 *Inc.*, 501 U.S. 680, 702 (1991).  Rather, his construction is entitled to controlling weight
21 so long as it falls "within the bounds of reasonable interpretation."  *Your Home Visiting*
22 *Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 453 (1999).

23 The task of a court reviewing the Secretary's reading of his own regulations "is
24 not to decide which among several competing interpretations best serves the regulatory
25 purpose," *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), but rather "the
26 agency's interpretation must be given'controlling weight unless it is plainly erroneous
27
28

- 8 -

1 or inconsistent with the regulation." *Id.* (quoting *Bowles v. Seminole Rock & Sand Col.*, 325 U.S. 410, 414 (1945)).

### IV. Analysis

    *A.    The Secretary's Decision and the Plain Language of the IME Regulation.*

Plaintiff argues that Congress has spoken directly on this issue, given the plain language of 42 U.S.C. § 1395ww(d)(5)(B), which dictates that "the Secretary shall proved [the IME payment] in an amount computed in the same manner as the adjustment for such costs under regulation in effect as of January 1, 1983," except as modified by Congress.

The Secretary has adopted regulations incorporating the various Congressional IME enactments. The Secretary's regulations detail the steps necessary to calculate the Congressionally mandated equation, which is summarized as follows:

$$[\{1 + (R/B)\}n - 1] \times c = \text{"IME Adjustment Factor"}$$

In the equation, "R" equals the hospital's full-time equivalent interns and residents; "B" equals the number of the hospital's beds; "n" is the "teaching activity" factor of .405; and "c" is an adjustment factor set by statute. See 42 U.S.C. § 1395ww(d)(5)(B)(ii).

In his regulations, the Secretary defines "n" as the "factor representing the effect of teaching on inpatient operating costs . . . " 42 C.F.R. § 412.105(c). This teaching activity factor is not applied to the costs of services but to the size of the residency training program as measured by the resident to bed ratio.

The interpretation at issue is located at 42 C.F.R. § 412.105(f)(1), which states, in relevant part:

    (1)    For cost reporting periods beginning on or after July 1, 1991, the count of full-time equivalent resident for the purpose of determining the indirect medical education adjustment is determined as follows:

    (i)    The resident must be enrolled in an approved teaching program.

    ...

1       (ii)    In order to be counted, the resident must be assigned to one of the
2 following areas:

3       (A)    The portion of the hospital subject to the prospective payment system.

4       (B)    The outpatient department of the hospital.

5 42 C.F.R. § 412.105(f)(1)(i)-(ii). In addition, "full time equivalent status is based on
6 the total time necessary to fill a residency slot."

7       Plaintiff submits that the Hospital's residents met both of the regulatory
8 requirements for inclusion in the Hospital's IME FTE resident count: 1) The residents
9 were enrolled in approved teaching programs, and 2) The residents were "assigned to"
10 the PPS or outpatient departments of the hospital.

11       Defendant argues that the authorizing statute cannot reasonably be construed as
12 prohibiting the Secretary from excluding scholarly research from the FTE count. As
13 of January 1, 1983, there were no regulations published in the CFR that established an
14 FTE count pursuant to 42 U.S.C. § 1395ww(a)(2) at all. So long as research time could
15 have been permissibly excluded from the FTE count used for purposes of the IME
16 adjustment applied under a reasonable construction of the old cost-limit regime, that
17 outcome is "within the bounds of reasonable interpretation" here.

18       Defendant further argues that the language of the regulation requiring
19 assignment of interns or residents to a "portion of the hospital subject to the prospective
20 payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A)(1999) can plausibly read to exclude
21 assignment to the area of scholarly research for the reason that the costs of research are
22 not subject to being reimbursed by the prospective payment system.

23       Defendant asserts that the issue in this case comes down to a question of what
24 it means to say that a resident or intern has been assigned to the "portion of the hospital
25 subject to the prospective payment system." Defendant argues that "portion" means a
26 "share" or "a part of any whole, either separated from or integrated from or integrated
27 with it," *citing Random House Webster's Unabridged Dictionary* 1507 (2d ed. 2001).

28

- 10 -

From this, it follows that the "portion" of the hospital, in turn, that is "subject to" payment under "the prospective payment system" is that portion wherein, at any given moment, "covered hospital inpatient services" are "furnished to beneficiaries." 42 C.F.R. § 412.20(a). Thus, Defendant urges, the share of the hospital subject to PPS logically excludes any portion wherein any activities other than the furnishing of patient-care services are being conducted.

Plaintiff argues that this regulation was properly analyzed by the court in *Riverside Methodist Hospital v. Thompson*, 2003 U.S. Dist. LLEXIS 15163. The Secretary's attempt to read a patient care requirement into the regulation was specifically addressed and denied by the Southern District of Ohio in *Riverside Methodist*. 2003 U.S.Dist. LEXIS at *14-15.

Defendant submits that the decision in *Riverside Methodist* (on which the PRRB relied) came to a contrary conclusion only by failing to follow its own line of reasoning to its logical conclusion. Where the decision went wrong, Defendants argue, was in failing to take the analysis one step further and examine what it means - in light of the entire Medicare statutory and regulatory scheme developed over the last four decades - for a resident to be said to be "assigned" to a "portion of the hospital subject to the prospective payment system." When that analysis is undertaken, it becomes clear that there was never any need for the Secretary to impose any additional requirement related to "providing care for specific patients" in order to exclude research time from the FTE count. The mistake made by the *Riverside Methodist* court was to assume, without analysis, the very question that was in dispute: whether a student doctor is assigned to a portion of the hospital subject to PPS or to the outpatient department when he is assigned to the area of scholarly research.

The Magistrate Judge agrees with the reasoning and decision of the District Court in *Riverside Methodist*. The regulation is not ambiguous, and, when considered in context with the historical intent of both the regulation and its governing statute, it

- 11 -

is evident that all time spent by residents in research and other scholarly activities while they are "assigned to" the Hospital must be included when determining the Hospital's resident count for purposes of calculating the IME payment.

The Defendant's argument that the term "portion," as used in the regulation, implies a "direct patient care" requirement, is successfully refuted by the Ninth Circuit's interpretation of a nearly identical regulation in *Alhambra Hospital v. Thompson*, 259 F.3d, 1071, 1073-75 (9th Cir. 2001).

Further, it is clear from the plain meaning of the phrase "portion of the hospital subject to the prospective payment system" in 42 C.F.R. § 412.105(f)(i), that the term is geographic in nature.

Thus, the Magistrate Judge finds that, the IME regulation being unambiguous, the Secretary's interpretation in this instance is owed no deference. *Thomas Jefferson*, 512 U.S. at 512.

B.      *Retroactivity and Rulemaking*

Plaintiff submits that the Secretary has imposed substantive requirements upon the Hospital in violation of the APA's rulemaking requirements by holding that only time directly related to patient care can be included in the Hospital's FTE resident count.

Plaintiff also submits that the Secretary has retroactively applied the August 1, 2001 change in the IME regulation to the Hospital's 1998 and 1999 cost reports, in violation of section 551 of the APA.

As summarized by the Defendant in this case, if the Secretary has construed his regulation permissibly, then he has not created any new substantive rule. If he has not construed his regulation permissibly, then it does not matter whether the erroneous reading is characterized as substantive or interpretive. The Plaintiff concedes that the resolution of this issue is not necessary for a decision favorable to the Hospital in this case.

As the Magistrate Judge finds the Defendant has not construed his regulations permissibly, a recommendation as to the retroactivity and rulemaking arguments is not necessary to resolve the issue in this case.

**V.     Recommendation**

The Magistrate Judge recommends that the District Court, DENY Defendant's Motion for Summary Judgment (Doc. No. 19.) and GRANT Plaintiff University Medical Center Corporation's Cross-Motion for Summary Judgment (Doc. No. 23.)

Pursuant to Title 28 U.S.C. § 636(b), any party may serve and file written objections within 10 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number: CIV 05-495-TUC-JMR.

DATED this 15th day of February, 2007.

_____
Bernardo P. Velasco
United States Magistrate Judge